In the Matter of THE CITY OF BUFFALO, Petitioner, v THOMAS N. RINALDO et al., Respondents.

Fourth Department, February 25, 1977

*Leslie G. Foschio (Joseph A. Tringali* of counsel), for petitioner.

*Martin L. Barr (Anthony Cagliostro* of counsel), for Thomas N. Rinaldo and another, respondents.

*Sargent & Lippes (Nicholas Sargent* of counsel), for Buffalo Police Benevolent Association, Inc. respondent.

MARSH, P. J. In this article 78 proceeding the City of Buffalo seeks to vacate and annul an arbitration award made

pursuant to compulsory arbitration mandated by Civil Service Law (§ 209, subd 4). Pursuant to *Caso v Coffey* (41 NY2d 153) we treat the proceeding as one under CPLR article 75 and PERB's motion to dismiss the proceeding against it and the public arbitration panel should be granted.

The arbitrators awarded the City of Buffalo Police Department employees a 5% across-the-board wage increase retroactive to July 1, 1975. In dollar terms the award meant approximately a three million dollar operating budget item to be paid out of the 1976-1977 budget terminating on June 30, 1977. The three million dollar cost estimate is not disputed by the respondent Buffalo Police Benevolent Association (PBA).

Charles Dawson, the fiscal consultant to the Buffalo Police Benevolent Association, presented three written financial analyses introduced into evidence before the panel attempting to establish that the City of Buffalo could afford a $6,000,000 salary payment increase for the Buffalo Police Department to be paid under the 1976-1977 fiscal budget.

His original funding plan assumed that the city had underestimated sales tax revenues to be received in fiscal 1976-1977 by 1.7 million dollars. He proposed the use of 2.9 million dollars of the city's so-called program surplus of four million dollars, entitled, by the budget as a reserve for liquidation of prior year's deficits to fund a portion of the PBA wage demand. The loss of 2.9 million dollars from the four million dollar reserve for reduction of the accumulated deficit as of July 1, 1975 in the amount of 13.4 million dollars would be compensated for by transferring 2.9 million dollars of what he recognized as uncollectible railroad taxes to collectible status on the asset side of the general fund balance sheet, thus reducing the deficit in the unappropriated surplus account by 2.9 million dollars. He justified the transfer of railroad property taxes owed by bankrupt railroads to a collectible status by reference to the new Federally subsidized Conrail System, but presented no legal basis or assurance of any new Federal policy for assuming payment by Conrail of these taxes long in default. Recognizing this, he made reference to the ease with which, he asserted, the city could return 2.9 million dollars to uncollectible status. There is no reason to believe that the financial community would be favorably impressed with this method of reducing the accumulated operating deficit.

The remainder of Dawson's first funding plan consisted of taking one million dollars from the judgment and claims

account for 1976-1977 and one million dollars from the reserve for capital improvement in the 1976-1977 budget.

He also submitted a revised funding plan to the panel in which he proposed using 3.6 million dollars of the reserve for accumulated deficit, leaving only a balance of .4 million dollars to apply at the end of the 1976-1977 budget year to the accumulated deficit. This revised plan also assumed an underestimate of 1.7 million dollars with respect to the sales tax. One million dollars would be obtained from the capital improvements budgeted amount and .3 million dollars from sundry underestimated sources.

Dawson's final funding plan reduced his estimate of the budget understatement of the sales tax for the 1976-1977 fiscal year to 1.2 million dollars. As a new unbudgeted revenue item, 2.4 million dollars would be obtained from his designation of an underestimate in the budget of the State revenue sharing for 1976-1977. One million dollars would continue to be provided by a transfer from the reserve for capital improvements and only two million dollars from the four million dollar appropriation in the budget to retire the accumulated deficit. The reason given for the reduction in the estimated sales tax surplus over the city budget estimate was the decrease in sales tax revenues by 11% in the fourth quarter of the city's 1975-1976 fiscal year ending June 30, 1976 over the same quarter the previous year. The sales tax income for the fiscal year 1975-1976 totaled $28,321,413. The 1976-1977 city budget estimated that $29,645,000 would be returned to the city in sales taxes representing approximately a 5% increase over the previous year's actual receipts. While the third quarter of the 1975-1976 fiscal year showed an increase in sales tax receipts of approximately 26% over the same quarter of the previous year, the fourth quarter of the 1975-1976 fiscal year showed an 11% decrease. The witness assumed about a 9% increase in his allegation of a 1.2 million dollar underestimate of fiscal 1976-1977 sales tax revenues in the budget. Much of Dawson's optimism derived from the 26% increase for the third quarter, which included an additional month's payment pursuant to a new sales tax law instead of the prior practice of large vendors remitting quarterly. This impact felt at the inception of the new remitting schedule for large vendors would not be evident in subsequent quarters. No sound basis appears for concluding that the city will obtain one million dollars in sales tax revenues over its budgeted

estimate which in itself is a 5% projected increase over fiscal 1975-1976.

The arbitration panel in its award cited a funding source of 2.4 million dollars to be derived from a projected 13% increase in State revenue sharing. This figure presented by PBA's witness Dawson is based upon an unsigned letter from the office of a member of the State Senate which referred to an estimate made by a Dr. Richard Decker of the budget office in Albany. The City of Buffalo cannot be expected to plan its estimated revenues based upon what someone in a Senate office heard from an employee of the State Division of the Budget six months before the Governor was to submit his budget requests for revenue sharing. To credit this as a revenue source for the city is fiscal irresponsibility in the extreme. There is no reasonable basis demonstrated in the record for a conclusion that the city will obtain any increase in State revenue sharing.

The last item cited by the arbitration panel as a source of funding for its 5% award refers to a potential four million dollar grant by the Federal Government pursuant to an amendment to the Public Works and Economic Development Act of 1965 (US Code, tit 42, § 3121 *et seq.*). The thrust of this bill aims at funding certain local public works projects which cannot be handled within local budgets. It seeks to provide for the construction of needed public works, reduce unemployment and provide some funds for high unemployment areas where local budgetary problems have necessitated cutbacks in essential municipal services. These grants apparently could flow to the City of Buffalo over a 15-month period. To the extent that the grants are used for specific public works projects that have prior Federal approval, none of such funds would be available for increasing the salaries of the Police Department, nor would the funding of local public works projects free money for police raises that would otherwise be allocated to such projects. The fiscal 1976-1977 budget has a 5-year program of capital improvement in the amount of $45,000,000. However, 1976-1977 is the second year providing for zero capital improvements due to the inability of Buffalo to sell any of its bonds. It appears that the City of Buffalo cannot even issue budget notes, the only source of funding to finance operational cash gaps being a very restricted form of revolving credit with local banks. The capital budget for the current fiscal year is 9.5 million dollars which cannot be put into

effect unless the city is permitted back into the bond market. A letter from the administrative vice-president of Marine Midland Municipals Company, addressed to James Burns, Commissioner of Administration and Finance of the City of Buffalo received in evidence, advises Commissioner Burns that the city's Ba rating by Moody's makes the City of Buffalo ineligible for the bank's underwriting of municipal securities. The 1.5 million dollars that the city has included in the capital account as a reserve for capital improvements for fiscal 1976-1977 is intended for use as a down payment on the capital budget should Buffalo be permitted to re-enter the bond market or to be used directly on needed capital improvements. In fact, $400,000 is earmarked for street cleaning equipment. An inability to enter the bond market prevents even the resurfacing of badly deteriorated streets for which no money is available. Nor is there money available for the replacing of police cars and the demolition of private buildings. The arbitration panel assumes that some of the counter-cyclical money under the Federal Public Works bill might be available for police pay raises. The intent of the bill with respect to such potential fund allocations is that they be used to maintain services not for pay increases. It appears that the Police Department budget had to be pared by two million dollars for fiscal 1976-1977 which necessitated layoffs of needed uniformed personnel. Presumably, Federal guidelines for counter-cyclical funds to maintain essential services would require the moneys to be used to prevent such layoffs. It is unfounded speculation to assume that any moneys forthcoming under the Public Works and Economic Development Act of 1965 amendments could be used to fund pay increases. In fact, the only reasonable inference is that such funds would not be permitted to be used for that purpose.

Based upon the record before the arbitrators the City of Buffalo has carried its burden in establishing the invalidity of the arbitration award. The evidence supports overwhelmingly the conclusion that the City of Buffalo does not have the funds available to pay out of the 1976-1977 budget a three million dollar award for a 5% retroactive wage increase to the employees of the Police Department. The four million dollar reserve to reduce the accumulated deficit cannot be touched if the city is ever to re-enter the bond market. If the city is not permitted to re-enter the bond market and substantial funds from other sources are not forthcoming, the physical plant of

the city will deteriorate into a desperate condition of decay and disrepair involving streets, sewers, buildings and machinery. There is a budgeted reserve for a Buffalo Municipal Housing Authority deficit of 1.7 million dollars; however, the total deficit for fiscal 1975-1976 ultimately totaled 1.9 million dollars and the fiscal 1976-1977 deficit could easily exceed that. The reserve for judgment and claims could not absorb the excess by reason of a recent Court of Appeals affirmance of a 1.7 million dollar award to skilled tradesmen of the Buffalo School Board which will absorb the entire 1.7 million dollar reserve for judgment and claims. The taxing authority of the City of Buffalo is exhausted because legislation enacted on an emergency basis since the decision in *Hurd v City of Buffalo* (34 NY2d 628) freezes allowable tax collections to their previous year's level if the option to exclude certain pension payments from the 2% constitutional limit is exercised (L 1976, ch 349). Hence, the city could not fund the pay raise by increasing the subsequent year's taxes. Even if the city could increase its taxes, the tax rate is already set for fiscal 1976-1977; hence, any budget gap could not even be met by issuing budget notes in anticipation of future taxes, for the banks will not invest in city securities so long as it maintains a Ba Moody investor services rating.

There was no rational basis in the record before the arbitration panel for concluding that the city has the ability to fund a three million dollar wage increase retroactive to July 1, 1975 and any finding to the contrary must be based on pure conjecture and speculation and without regard for the demonstrated facts of the catastrophic fiscal crisis confronting the City of Buffalo. The conclusion by the arbitrators that such funding ability does exist is clearly arbitrary and capricious *(Caso v Coffey*, 41 NY2d 153, *supra).*

The award of the arbitrators should be vacated and annulled, PERB's motion to dismiss the proceeding against it and the public arbitration panel should be granted and the dispute may be submitted to new arbitrators for a new award upon application to PERB of the petitioner, City of Buffalo, or respondent, Buffalo Police Benevolent Association, Inc.

SIMONS, DILLON, GOLDMAN and WITMER, JJ., concur.

Award unanimously vacated and annulled and motion to dismiss proceeding granted, without costs, in accordance with opinion by MARSH, P. J.